UNDERHILL v. ALLIS–CHALMERS MFG.
CO. et al.

In re CLIFTON.

(Circuit Court of Appeals, Eighth Circuit.
September 13, 1926.)

No. 7192.

1. Landlord and tenant ⬯319, 326(3)—Farm lease held to create relation of landlord and tenant as to land, and of tenants in common as to crops.

Under a farm lease for a definite term, with usual covenants against waste and for delivery of the land at the end of the term, and providing that the land shall be seeded in wheat, and the tenant shall deliver one-third of the crop raised to the landlord in elevator or bin, at his option, the relation between the parties held that of landlord and tenant as to the land, and of tenants in common as to the crop.

2. Landlord and tenant ⬯326(1)—Provision in lease for division of crop is not one for payment of rent, but an exception from the thing demised.

Where a contract is a lease, and creates the relation of landlord and tenant as to the land, a provision for division of the crops is an exception from the thing demised rather than a reservation of rent.

Appeal from the District Court of the United States for the District of Colorado; John Foster Symes, Judge.

In the matter of Fred Clifton, bankrupt. From an order of the District Court, denying the petition of Clarence Underhill for reclamation of property and reversing an order of the referee on petition for review presented by the Allis-Chalmers Manufacturing Company and others, said Underhill appeals. Reversed, with instructions.

Alfred Todd, of Lamar, Colo. (Todd & Underwood, of Lamar, Colo., on the brief), for appellant.

George B. Baker, of Denver, Colo. (Gordon & Gordon, of Lamar, Colo., and Phelps & Baker, of Pueblo, Colo., on the brief), for appellees.

Before LEWIS, Circuit Judge, and FARIS and PHILLIPS, District Judges.

PHILLIPS, District Judge. This is an appeal, under section 24a of the Bankruptcy Act (Comp. St. § 9608) from an order of the District Court in the bankruptcy proceedings of Fred Clifton, bankrupt. The facts are these:

On April 14, 1923, Clarence Underhill, the appellant, and Fred Clifton, the bankrupt, entered into a written contract. In this contract, Underhill is referred to as party of the first part, and Clifton as party of the second part.

The contract recites that the party of the first part is the owner of certain tracts of land in Prowers and Kiowa counties, Colo., and that said lands are comparatively unfenced and unimproved, and then proceeds in the following language:

"Now, therefore, it is agreed by and between the parties hereto that the party of the first part will furnish necessary materials and supplies for the fencing of all of said lands, as may be necessary for the protection of crops grown thereon from stock, and will lease and let unto the said party of the second part all of the above-described lands from the 14th day of April, 1923, for and until the 1st day of September, 1924, on the terms and conditions hereinafter set forth.

"The said party of the first part further agrees to pay to the said party of the second part the sum of $3.50 per acre for the plowing of all of said unbroken land, on the properties above described; and for and in consideration of the lease and use of said land above described, and of the furnishing of material for fencing the same, and paying for the plowing of the same, the said party of the second part agrees to erect and construct all necessary fences on said land for the protection of crops grown thereon, and further agrees to break and plow all of said

land not in cultivation and to plow without charge all land that has heretofore been broken, and to put all of said land in proper and farmlike condition for growing crops, and to furnish seed wheat and put it in wheat; to cut, thresh, harvest, and care for said crop when grown, and deliver one-third of the same to the party of the first part in elevator or bin, at his option, at the reasonable and usual place for marketing the same. All of said work, building of fences, plowing, cultivating land, breaking said land, preparation, cultivation, sowing, gathering, harvesting and marketing, to be done in a good, sufficient and farmlike manner."

The contract further provides that the party of the second part shall not commit waste, and shall keep the fences, buildings, and other improvements in repair, and at the termination of the lease shall surrender the premises, and that if he fails to surrender the premises he shall be held "as and for a tenant under forcible detainer, and liable to be ejected therefrom by party of the first part, on account of his holding over."

Under this agreement, Clifton plowed about 2,500 acres of the land. He prepared the ground and sowed in wheat, approximately 1,500 acres thereof. He harvested the crop in July, 1924. He commenced threshing the wheat in September, 1924, and up to and including September 15th had delivered approximately 1,600 bushels of the wheat to the Holly Elevator at Bristol, Colo. He instructed the elevator company to credit the same, one-third to Underhill and two-thirds to Clifton. About the same time, Underhill gave the elevator company the same instruction.

Underhill paid to Clifton, for plowing and for materials and supplies used for fencing the land, approximately $8,000.

On the 13th, 18th, 19th, and 20th of September, respectively, four writs of execution on judgments obtained against Clifton were placed in the hands of the sheriff of Prowers county, who undertook to garnishee the wheat in the Holly Elevator and to levy upon the unthreshed wheat in the fields.

The First National Bank of Eads held a chattel mortgage on the two-thirds interest of Clifton in the wheat grown upon 480 acres of the land in Prowers county, and 160 acres in Kiowa county. It demanded that the sheriff release the levies upon the wheat included in its mortgage. The sheriff demanded indemnity from the execution creditors. They failed to furnish same, and on September 24th the sheriff released from the levy the wheat covered by the mortgage.

Underhill and the Bank of Eads agreed that the bank should take possession of, thresh, and market the wheat grown on the 640 acres on which the bank held a mortgage upon Clifton's two-thirds interest, and should account to Underhill for his one-third interest therein.

On October 3, 1924, Clifton filed his voluntary petition in bankruptcy, and on the following day was adjudicated a bankrupt.

Upon adjudication of Clifton as a bankrupt, J. D. Spooner was appointed as receiver to take charge of the crop not covered by the mortgage of the Bank of Eads, and at the first meeting of creditors he was appointed trustee. As such receiver and trustee, he proceeded to complete the threshing and marketing of the wheat, except that covered by the mortgage to the Bank of Eads. Underhill made demand on the receiver and trustee for his one-third of the wheat or the proceeds thereof. This demand was refused, upon the ground that the wheat belonged to the estate of the bankrupt. Because of this claim on the part of the trustee, the Bank of Eads declined to pay over to Underhill the proceeds of his one-third interest in the wheat threshed and marketed by it. Thereupon Underhill filed his petition with the referee in the bankruptcy proceedings, setting up the facts and the several amounts and proceeds in the hands of the Holly Elevator, the Bank of Eads, and the trustee in bankruptcy, and prayed for an order requiring the release and payment to him of one-third of the proceeds derived from the sale of the wheat.

The matter came on for hearing before the referee. The referee held that Underhill owned an undivided one-third interest in the wheat, and that there was due to him on account thereof from the trustee in bankruptcy the sum of $4,363.48, and on June 11, 1925, entered his order accordingly. Upon petition of the trustee, the referee then duly certified the matter to the District Court for review. The Allis-Chalmers Manufacturing Company and Grant McFerson, as state bank commissioner of Colorado, general creditors, on leave obtained from the referee, appeared and participated with attorneys for the trustee in presenting the petition for review.

The District Court held that the agreement between Underhill and Clifton was a lease, that the portion of the crop which the agreement provided should be delivered by Clifton to Underhill was rent, that Underhill had acquired no lien upon or title to any part of the wheat, and that his rights were that of a general creditor.

On August 12, 1925, the District Court entered the order appealed from, in which it reversed the order of the referee, and direct-

ed the latter to allow the claim of Underhill as a general creditor.

[1] The written contract uses the language "lease and let." It is for a definite term. It contains provisions that Clifton shall not commit waste, that he shall keep the premises in repair, that he shall surrender them up at the termination of the lease, and that, if he fails to surrender them, he shall be liable as a tenant holding over. We agree with the conclusions of the District Court that this contract was a lease, and, as to the land, created between Underhill and Clifton the relation of landlord and tenant. But those conclusions are not decisive of the question here presented. Under such a contract the relation between the parties as to the land may be that of landlord and tenant, and as to the crops that of tenants in common. Woodsend v. Chatom, 191 Cal. 72, 214 P. 965, 966. Halsey v. Simmons et al., 85 Or. 324, 166 P. 944, 945, L. R. A. 1918A, 321; Fuhrman v. Interior Warehouse Co., 64 Wash. 159, 116 P. 666, 37 L. R. A. (N. S.) 89; State ex rel. Gillilian v. Municipal Court of City of Crookston, 123 Minn. 377, 143 N. W. 978, 979; Schmitt v. Cassilius, 31 Minn. 7, 16 N. W. 453, 454; Moser v. Lower, 48 Mo. App. 85, 89; Moulton v. Robinson, 27 N. H. 550; Daniels v. Brown, 34 N. H. 454, 69 Am. Dec. 505; Hatch v. Hart, 40 N. H. 93; Wentworth v. Portsmouth, etc., R. Co., 55 N. H. 540; note 37 Am. Dec. 318; 8 R. C. L. 374, § 21.

We do not find that the courts of Colorado have passed upon the exact question here presented. However, under the great weight of authority in other jurisdictions, in the absence of qualifying provisions evincing a contrary intent, a contract whereby the use of land is given to a person to cultivate and return to the owner a specified portion of the particular crop produced thereon creates a tenancy in common in the crop, and this is true whether the agreement between the parties is a lease or a cropping contract. Moulton v. Robinson, 27 N. H. 550; Woodsend v. Chatom, supra; Fuhrman v. Interior Warehouse Co., supra; Halsey v. Simmons, supra; De Wolfe v. Kupers, 106 Or. 176, 211 P. 927, 929; Abernethy v. Uhlman, 52 Or. 359, 93 P. 936, 938, 97 P. 540; Messinger v. Union Warehouse Co., 39 Or. 546, 551, 65 P. 808, 809; Straight Bros. Co. v. Chicago, M. & St. P. Ry. Co., 183 Iowa, 934, 167 N. W. 705, 706, 707, 708; Minneapolis Iron Store Co. v. Branum, 36 N. D. 355, 162 N. W. 543, 552, L. R. A. 1917E, 298; Schmitt v. Cassilius, supra; Strangeway v. Eisenman, 68 Minn. 395, 71 N. W. 617; McNeal v. Rider, 79 Minn. 153, 81 N.

W. 830, 831, 832, 79 Am. St. Rep. 437; State v. Municipal Court, supra; Moser v. Lower, supra; Pearson v. Lafferty, 197 Mo. App. 123, 128, 193 S. W. 40, 42; Putnam v. Wise, 1 Hill (N. Y.) 234, 37 Am. Dec. 309; Aiken v. Smith, 21 Vt. 172; Sowles v. Martin, 76 Vt. 180, 56 A. 979; Adams v. State, 87 Ala. 89, 6 So. 270; Walker v. Fitts, 41 Mass. (24 Pick.) 191; State v. Jewell, 34 N. J. Law, 259, 260; Scott v. Ramsey, 82 Ind. 330; note, 98 Am. St. Rep. 959; 8 R. C. L. p. 374, § 21; 16 R. C. L. p. 585, § 60 ; Tiffany, Landlord & Tenant, vol. 2, § 253b, pp. 1650–1655.

In Fuhrman v. Interior Warehouse Co., supra, the court said:

"The weight of authority is that every contract whereby use of land is given to a party to cultivate and return to the owner a specified portion of the crop produced creates a tenancy in common in the crop, and that this is true, whether the agreement between the parties is a lease or a mere cropping contract. The tendency of the courts is to hold that, whenever there is a provision in any form of contract for a specific division of crops produced, a tenancy in common arises therein."

In Pearson v. Lafferty, supra, the court said:

"It appears that the trend of judicial authority is to hold that a contract whereby one is allowed the use of land to cultivate, the owner to have a share of the produce for its use, will, in general, at least, create a tenancy in common in the growing crop; and this is said to be so, whether the agreement operates as a lease or a mere 'cropping contract.'"

In Messinger v. Union Warehouse Co., supra, the court said:

"The editors of the American Decisions, in the notes to the case adverted to [Putnam v. Wise (1 Hill [N. Y.] 234) 37 Am. Dec. 309], have collated the decisions compatible with the doctrine announced in the principal case, from which it appears that, in the absence of any stipulation evidencing a contrary intention of the parties, the rule that an agreement by which land is let to be cultivated for a share of the crops does not constitute a lease, but that the owner and occupier are tenants in common of the products of the soil, prevails in the following states: Alabama, Maryland, Michigan, New Hampshire, New Jersey, New York, and Vermont. We believe the rule adopted in those states is conducive of the best interests of the respective parties, and, while the person who agrees to cultivate the land for a part of the crop has possession of the premises, he and the

owner thereof are tenants in common of the products to be divided, and the latter impliedly reserves the right to remove his share, if necessary, without the consent of the occupier."

[2] The rationale of the doctrine of tenancy in common in the crops, in those cases where the contract is a lease and creates the relation of landlord and tenant as to the land, is that the provision for a division of the crops is an exception from the thing demised rather than a reservation of rent. Where the provision for division of the crops is susceptible of such a construction, a logical basis is afforded for holding that the parties own the crops prior to division as tenants in common. Tiffany, Landlord & Tenant, vol. 2, p. 1654; Moulton v. Robinson, supra.

The contract in the instant case provided that Underhill should furnish the necessary materials and supplies to fence the land and protect the crops. It provided for a division of the particular crops produced. The language is, "and deliver one-third of the same to the party of the first part in elevator or bin at his option." This is not a covenant to pay one-third of the crop as rent, but to make delivery to the landlord of that share of the crop which belongs to the landlord. It may be properly construed to be an exception from the thing demised rather than a reservation of rent. Such a construction, in our opinion, will best effectuate the intention of the parties as evinced by the provisions of the contract.

We therefore conclude that, at the time of the filing of the petition in bankruptcy, Underhill owned an undivided one-third interest in the wheat as a tenant in common with Clifton, and that only the undivided interest of Clifton passed to the trustee in bankruptcy. The decision of the District Court is therefore reversed, with instructions to confirm the order of the referee and assess the costs against the appellees.